1816.

LYON
v.
RICHMOND.

*LYON and BROCKWAY *against* RICHMOND and others.

A subsequent decision of the Court of Errors, in a different case, giving a different exposition of a point of law from the one declared by the Supreme Court, when the parties to a suit entered into an agreement relative to such suit, can have no retrospective effect, so as to destroy the operation of such agreement.

The Court does not relieve parties from their acts and deeds fairly done, on.a full knowledge of the facts, though under a mistake of the law. Every person is charged, at his peril, with a knowledge of the law.

ON the 31st of *December*, 1807, the plaintiff *Brockway* was committed to gaol on a *ca. sa.* issued out of the Supreme Court, at the suit of *Benjamin Tallmadge*, and seven others, defendants, for 2,677 dollars and 24 cents. On the 31st of *March*, 1808, *Lyon*, the plaintiff, and *Dewey*, defendant, became security to *Richmond*, defendant, sheriff of the county, for the gaol liberties granted to *Brockway*. *Richmond* was afterwards sued by the plaintiffs, in the execution, for the escape of *Brockway*, and the cause was tried at the *Cayuga* circuit. in *June*, 1811, when a verdict was found for the plaintiffs, under the direction of the judge. The construction of the act relative to the gaol liberties, by the judge, having given dissatisfaction, it was proposed to bring a writ of error; and the bill stated, that to induce *Richmond*, the sheriff, to place the management of the cause in the hands of the plaintiffs, they and the defendant *Dewey* confessed a judgment to *Richmond*, on the bond given to him for the gaol liberties, for his greater security; in consideration of which, *Richmond* agreed to give up the future defence and conduct of the suit to the plaintiffs and the defendant *Dewey*. That a case was accordingly settled in the cause, with liberty to turn the same into a special verdict, and a writ of error was brought at the expense of the plaintiffs. That the plaintiffs in the execution, and *Richmond*, fraudulently combined together to supersede *the writ of error, by his, *Richmond*, assigning the judgment so confessed to him by the plaintiffs and *D.* to the creditors in the execution, and releasing the errors in the judgment obtained against him for the escape, and discharging the writ of error ; and that, in consideration thereof, the creditors at law agreed to release *Richmond* from the payment of that judgment, and from all liability for the escape, which was accordingly done. That previous to this agreement, *Richmond* applied to the plaintiffs and *Dewey*, to deposit the amount of the judgment, which not being in their power, they offered

Nov. 18th,1815, and Jan. 15th, 1816.

[ * 52 ]

further and sufficient security, which *Richmond* refused to accept; and carried into effect his agreement with the plaintiffs at law. That the previous security was ample, and *Richmond* applied for the security, as a pretence of violating his agreement, on receiving confession of the judgment. That the creditors instigated *Richmond*, by their attorney and agent, to make the application, from a belief that their judgment against *Richmond* for the escape would be reversed in the Court of Errors; that while *Lyon* was embarrassed and distressed at these proceedings, the agent of the plaintiffs at law represented to him that *Dewey* had property of *Brockway*, the original debtor, in his hands, sufficient to indemnify him, which might be withdrawn, and *Lyon* be thus left to pay the whole, but which might be secured by an execution issued on the judgment so confessed; that *Lyon*, yielding to such representation, consented to waive the stay of execution; and that it might issue on the judgment; that the agent of the plaintiffs at law took advantage of *Dewey's* dissatisfaction at the issuing of the execution, to detach him from the plaintiffs *L.* and *B.*, and render him wholly unwilling to co-operate with the plaintiffs in seeking redress. That the Court for the Correction of Errors, having, in 1813, determined that the return of a debtor imprisoned on execution to the liberties of the gaol before suit brought against the sheriff for the escape, was a good defence, the reversal of *the judgment against *Richmond* for the escape was clear and certain, such decision being unquestionable evidence of the law on the subject, under which the plaintiffs at law could have no right to enforce the judgment so confessed to the said *Richmond* for his indemnity merely, against a liability which had not occurred. The bill prayed for an injunction against the execution, and for general relief.

[ * 53 ]

*Richmond*, *Dewey*, and *W. L. Tallmadge*, put in their joint and several answer, in which they denied that the plaintiffs and *D.* confessed judgment on their bond to *R.*, on his agreeing to give up the future conduct of the suit against him for the escape. *Richmond* said that he never sued out any writ of error, or authorized any person to sue such writ on the judgment against him, nor did he conceive himself bound to do so, though he should have been willing to have allowed the plaintiffs and *Dewey* to have prosecuted the writ in his name, if they had well indemnified him therefor, and against his liability to the plaintiffs on their judgment against him. That after the verdict, and before judgment was obtained against him, he became alarmed on being informed that *Lyon* was about conveying his real estate to one *N. Fisk*, and proposed to the attorney of the

plaintiffs at law to assign the judgment on the bond for the liberties, if they would discharge him from the suit for the escape; but they did not accede to the proposal. After judgment was obtained against him, the attorney of the plaintiffs at law proposed to take the assignment, and he, *R.*, called on *L.* and *D.*, and told them of the proposal, and that he would not assign the judgment, and would permit them to prosecute the writ of error, if they would deposit money sufficient for his indemnity, or give adequate security; and *L.* and *D.* said that they could not go beyond the security of the judgment, and sundry obligations, chiefly against *N. Fisk*, for a part of the amount of the judgment, and that they could not blame *R.* for availing himself of the *pro-posed arrangement. *R.* and *D.* stated further, that they and *L.* afterwards went to the attorney of the plaintiffs at law, and *L.* and *D.* made proposals to settle the suit against *R.*, but that, *L.* and *D.* disagreeing as to the amount which each was to pay or secure, the settlement did not take place; and *R.* said, that on the same day he did, with the knowl-edge and entire approbation of *L.*, assign the judgment on the bond to the plaintiffs at law, and receive a discharge from the judgment for the escape; that *Lyon* expressly agreed with the attorney of the plaintiffs at law, that execution might issue on the judgment so assigned, so as to obtain a due and just part of the amount out of the property of *D.*, the other surety; and that *L.* accompanied the sheriff to the house of *D.* in order to make the levy; and that on the day the assignment was made, he released all errors in the judgment against him for the escape, and which was then known to *L.*, and was no more than an act of justice. That the plaintiff *L.* acted, as *R.* believed, without any misconception of his rights, or any fraud or misrepresentation on the part of the defendants, or any other person.

[ * 54 ]

The defendants *T.* and *D.* denied any agreement to detach *D.* from the plaintiffs, and all fraud on *L.* to procure his assent to the assignment, &c., and averred that, according to their knowledge and belief, the facts, as stated by *R.* in his answer, were true. All the other defendants denied all knowledge of the facts stated in the bill; and they referred to the answer of the other three defendants, and stated that they believed and expected to prove the facts in that answer to be true, and prayed that the same might be taken as their answer, according to their information and belief.

*Joseph L. Richardson*, the principal witness on the part of the plaintiffs, stated, that the stipulation to confess judgment in the suit on the bond for the liberties, was

[ * 55 ]

given on the express agreement of the attorney of *Richmond*, that *L.* and *D.* should have leave, at their own expense, *to turn the case in the suit of *Tallmadge & Co.* against *R.* into a special verdict, and bring a writ of error thereon; to all which *Richmond* assented; and that they, *L.* and *D.*, employed counsel for the purpose.

That *L.* and *D.* remonstrated with *Richmond* against his assigning the judgment, who stated his reasons for doing it, and that he should assign the judgment, and release the errors in the suit for the escape, unless *L.* and *D.* would deposit the amount in money, or give satisfactory personal security; that *Lyon*, afterwards, offered *Nathan Fisk*, (proved by several witnesses to be a man of property,) to consent to give security for 1,800 dollars; but *Dewey* refused to furnish an equal amount; that *Lyon* then consented to the execution issuing against him and *B.* and *D.*, on *Mumford's* representing that *Dewey* had property of *Brockway* in his hands sufficient to discharge the greater part of the amount, which might be withdrawn. Another witness stated a conversation between *L.* and *R.*, in which *R.* admitted, that *L.* always opposed the assignment, but said, " You recollect that, after the assignment, I asked you if you blamed me," and *Lyon* replied, " I cannot blame any man for wishing to get out of trouble." Several witnesses testified to the hostility of *Dewey* towards *Lyon*.

The defendant *Dewey* was examined as a witness in the cause. His testimony, and that of *T. Mumford*, the attorney and agent of *Tallmadge & Co.*, supported all the material facts stated in *Richmond's* answer; and they both, after detailing all the circumstances relative to the assignment of the judgment, execution, &c., denied all knowledge of any fraud, misrepresentation, or concealment, on the part of *Tallmadge & Co.*, in obtaining the assignment and release of errors, but, on the contrary, said that the same was fairly obtained, and with the knowledge of *Lyon*. They also stated, that *Brockway*, the original debtor, was insolvent, and

[ * 56 ]

had applied to be discharged under the insolvent *act. *Jonathan Whitney*, a witness also for the defendants, deposed, that he saw *Lyon* and *Dewey* together at *Cayuga*, in 1812; and *Dewey* offered to secure 10 or 12 hundred dollars, on *Lyon's* securing the rest, so as to prevent the assignment, agreeably to what *Lyon* had before offered, but *Lyon* then insisted on *D.'s* securing 1,400 dollars, or that he, *Lyon*, would have nothing to do with the business, and that *Richmond* might take out an execution as soon as he pleased; and as his, *Lyon's*, property was secure, he did not care any thing about the execution; and that in consequence of this disagreement between *L.* and *D.*, the proposed arrangement

was not made; and the assignment by *Richmond* of the judgment against them and *Brockway*, to *Tallmadge* and the others, was made the next day.

The cause was argued on the 18th *November* last, by

*Gold*, for the plaintiffs, and

*Riggs*, for the defendants.

The following opinion was this day delivered by the Court:

THE CHANCELLOR.   A suit between these same parties, on the same subject, was brought to a hearing in *August* term, 1814, on demurrer to the bill, and the bill was dismissed.† There was, then, no charge of fraud in procuring or making the assignment and release stated in the case, and it appeared that the sureties of *Brockway* had no equity in their complaint against *Richmond*, the sheriff.   The charge against him was, that he had thought proper, for his own safety, to settle and discharge a judgment against him for an escape, after the sureties had neglected or refused, upon due notice, either to deposit money or to *give him other requisite security, and after they had assented to that arrangement.

The bill now contains the allegation that the assignment of one judgment, and the release of errors in the other, were procured by a fraudulent agreement between *Richmond* and *Tallmadge, Smith & Co.*, to the oppression and injury of the sureties of *Brockway*, in depriving them of the benefit of a writ of error on the judgment against *Richmond*.   The object of the bill, as explained by the counsel, is to obtain the liberty and the ability to prosecute such a writ of error, and an injunction to restrain the use of the release.   But as the charge of fraud is directly denied in the answer, and is not supported, but absolutely repelled by the proof, the cause would seem to rest now on the same ground precisely that it did before.

The answer of *Richmond* explicitly denies that the judgment in his favor was confessed by *Lyon* and *Dewey* upon any condition or agreement by him, to give them the future control of the judgment against *him*; and as there is but one witness who testifies to any such agreement, it cannot be considered as established.   The answer of *Richmond* equally denies the existence of any fraud, by concealment, misrepresentation, or otherwise, in procuring the assignment and release.   The proposition was fairly made to him, and

*Margin notes:*

1816.

LYON
v.
RICHMOND.

January 15th,
1816.

† 1 *Johnson's*
*Ch. Rep.* 184.

[ * 57 ]

he told the sureties of *B.* of the proposal, and that he would not assign the judgment he had against them, but would permit them to prosecute the writ of error in his name, on the judgment of the creditors against him, if they would deposit money, or give him other sufficient security by way of indemnity. They would not, and did not do either, and the proposition was finally carried into effect with their knowledge and approbation. That *Richmond* gave this information to *Lyon* and *Dewey*, and told them that he should

[ *58 ] assign his judgment against them, and should release *the errors in the judgment against him, unless they gave him that security, and that they did not comply, and that *Lyon* afterwards admitted that *Richmond* was free of blame in executing the assignment and release, are facts proved even by the complainants' witnesses. That the assignment and release were both executed with the full knowledge and approbation of the sureties, *Lyon* and *Dewey*, and with perfect fairness and candor, is proved by the two witnesses, *Dewey* and *Mumford*, with a precision and circumstantial detail, that demand our belief. There is nothing to shake the credit of their testimony. *Dewey* is a competent witness for his co-defendant *Richmond*. There is nothing prayed for or proved against him, to show him in default, or to charge him, in any event of the suit, with costs to the complainants. The answer of *Richmond*, supported by the testimony of these two witnesses, is perfectly decisive in favor of the fairness of the whole transaction, and the free and full knowledge and assent of *Lyon*. There is no evidence in contradiction to the plain narration of these witnesses. The previous reluctance of *Lyon* or *Dewey* to the assignment and release, as stated by the complainants' witnesses, is not inconsistent with their subsequent assent at the consummation of the transaction. The conduct of *Lyon*, in aiding and assisting the service of the execution issued after the assignment and release, is strong corroborating proof against his charge in the bill. Both *Richardson* and *Dewey* prove, that the previous proposal communicated to *Lyon*, related as well to the release of errors in one judgment, as of the assignment of the other. In short, I see no possible room to doubt of its being a fair transaction on the part of *Richmond*, founded on due previous notice and warning to the sureties of *Brockway*, and on their subsequent free and full acquiescence.

Fraud out of the case, I see no ground for the present bill; the assignment and release were fairly procured by

[ *59 ]         **Tallmadge, Smith & Co.*, and they are entitled, in law and equity, to hold them. If they, by their agent, were free from any improper conduct in procuring those deeds, there is no reason why this Court should interfere to deprive them

of the benefit of either, even if *Richmond* had not dealt kindly with *Lyon*. But I do not see that *Richmond* stands otherwise than perfectly acquitted. He made a fair proposition to those who had undertaken to indemnify him. He was entitled to be acquitted and discharged from his responsibility. A judgment had been recovered against him at law, after a defence made to the best of his power. He was not bound to expose himself to further risk. He had reason to apprehend danger to his remedy over. *Dewey* says he knows, that about the time of bringing the suit against *Richmond*, *Lyon* had conveyed his farm to one *Fisk*; and another witness (*Whitney*) heard *Lyon* say, before the assignment, that *Richmond* might take out execution as soon as he pleased, for that his property was secure. *Richmond* had, therefore, good right to demand of *Lyon* and *Dewey* perfect security, either in a deposit of money, or of other personal security, adequate to his indemnity, before he consented to continue longer exposed to the operation of the judgment against him. It was their duty to have made him secure, if they wished the use of his name to try the chance of a writ of error. They refused to give the security, either from inability or unwillingness, and when they gave their subsequent assent to the assignment and release, and the issuing of the execution, it was what they were competent to give, and to which they ought to be bound.

Much was said respecting a decision of the Court of Errors in another cause, in the year 1813, by which it is inferred, that if the sureties had been permitted to have prosecuted a writ of error on the judgment against *Richmond*, they would have been successful. Whether this would have been the case, and the judgment against *Richmond*, *and the judgment reversed on error in 1813, have been deemed so analogous in their circumstances as to have led to the same conclusion, is a question not before me, and which I shall not undertake to decide. I have nothing to do with such an inquiry. A subsequent decision of a higher Court, in a different case, giving a different exposition of a point of law from the one declared and known when a settlement between parties takes place, cannot have a retrospective effect, and overturn such settlement. The Courts do not undertake to relieve parties from their acts and deeds fairly done on a full knowledge of facts, though under a mistake of the law. Every man is to be charged at his peril with a knowledge of the law. There is no other principle which is safe and practicable in the common intercourse of mankind. And to permit a subsequent judicial decision in any one given case, on a point of law, to open or annul every thing that has been done in other cases of the like kind, for years before, under

1816.

LYON
v.
RICHMOND.

[ * 60 ]

1816.

LYON
v.
RICHMOND.

a different understanding of the law, would lead to the most mischievous consequences. Fortunately for the peace and happiness of society, there is no such pernicious precedent to be found. This case, therefore, is to be decided according to the existing state of things when the settlement in question took place.

There is a fact connected with this case, which is of great weight against *Lyon*, the complainant. I allude to the decree read at the hearing, and pronounced in *June* last, in the suit of *Tallmadge* and others against *Lyon* and others, in which a sale of the property of *Lyon* and *Dewey*, under the execution of the judgment so assigned, was charged with being affected with fraud, and that *Lyon* was a party to the fraud. The decree was taken by default against *Lyon* and others, and the sale set aside as fraudulent, and the complainants allowed to cause the property to be resold under that judgment. That decree has never been questioned, and remains good ; and can it be impeached in *this collateral way ? Can it now be said, in the face of that decree, that *Tallmadge* and others had no right or title to such a judgment and execution ? Nothing could be productive of more confusion, or more effectually destroy the credit and verity attached to judicial records.

[ * 61 ]

There is another difficulty which must embarrass the claim of the present plaintiffs. The answer of all the defendants under the firm of *Tallmadge, Smith & Co.*, except one, refers to, and adopts as their answer, the answer of *Richmond* and others, and no replication has ever been filed to their answer, by which it is, as to them, admitted to be true ; and if they are entitled to hold and enjoy in full right the assignment and release, it cannot be affected at all.

But these are minor considerations, and only serve to multiply the insuperable difficulties under which the pretension of *Lyon* labors. I place my opinion chiefly on broader ground ; on the absolute failure of the plaintiffs on the merits.

The bill must, accordingly, be dismissed as to all the defendants, with costs ; and every injunction heretofore issued, at the instance of the complainants or others restraining the defendants, or any of them, from proceeding under the judgment assigned as aforesaid, is hereby declared to be dissolved.

Decree accordingly. (*a*)

(*a*) On appeal, this decree was reversed, (*April* 4th, 1817,) by a majority (one only) of the Court of Errors : four of the judges of the Supreme Court were for affirming the decree.